MALCOLM E. SMITH and RUDOLPH C. CULVER, Appellants, *v.* CHAPIN HOME FOR THE AGED AND INFIRM, Respondent.

First Department, July 11, 1918.

**Principal and agent — action by real estate broker for commissions — evidence.**

In an action by real estate brokers to recover commissions it appeared that plaintiff's authority to sell was procured through a member of the advisory board and finance committee of the defendant corporation whose officers were women; that he had acted for the defendant concerning another sale; that it was through his instrumentality that others had been employed as agents, and that after the plaintiff had introduced a purchaser the officers and trustees of the defendant dealt therewith.

*Held,* on all the evidence, that it was error for the trial court to direct a verdict for the defendant holding that the plaintiffs were not the procuring cause of the sale.

Under the circumstances there was sufficient evidence to show the authority of the member of the advisory board of the defendant to act.

LAUGHLIN, J., dissented.

APPEAL by the plaintiffs, Malcolm E. Smith and another, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 24th day of January, 1918, upon the verdict of a jury rendered by direction of the court.

*Franklin Grady* of counsel [*Henry de Forest Baldwin* with him on the brief; *Lord, Day & Lord,* attorneys], for the appellant.

*George N. Hamlin* of counsel [*Rushmore, Bisbee & Stern,* attorneys], for the respondent.

MERRELL, J.:

Plaintiffs are real estate brokers and defendant is a New York corporation. In 1914 defendant owned a plot of land on the north side of Sixty-sixth street between Lexington and Third avenues in the city of New York, 150 feet wide by a little over 100 feet in depth, which it had offered for sale. Plaintiffs applied for and, as they contend, obtained authority from defendant to list the property for sale and to procure a purchaser therefor, and in their complaint allege their employment by the defendant as agents, and that plaintiffs procured a purchaser for the property for $200,000, and that by reason thereof they became entitled to receive the usual commission of one per cent, amounting to the sum of $2,000, for which judgment is demanded. At the close of the evidence the court directed a verdict for the defendant, holding that plaintiffs were not the procuring cause of the sale of defendant's property.

The two chief questions litigated upon the trial were, *first,* as to whether or not plaintiffs were employed by the defendant as its agents to sell the property; and, *second,* whether or not the sale which was finally made was procured by the plaintiffs. The learned trial court held with the plaintiffs upon the first proposition, but as to the second held that the plaintiffs were not the procuring cause of the sale that was made.

The officers of the defendant corporation who were actively concerned in the sale and conveyance of the property in question to the purchaser were Emma Fox, president of the

defendant, and Mary A. Stickney, its corresponding secretary. Neither of these officers had anything to do with the transaction between the plaintiffs and the defendant at its inception. The negotiations whereby plaintiffs claim employment by the defendant were carried on through one William B. Thom, who was not an officer nor a director of the defendant, but who occupied a position of member of the advisory board of the defendant corporation, which board consisted of fifteen members and with whom the trustees of the corporation consulted on questions of vital interest to it. Thom was also a member of the investment committee of said defendant corporation, consisting of three members of the advisory board. The duty of this committee was to pass on all financial questions, including real estate and other investments of the corporation, its action at all times being subject to the approval of the board of trustees. Whatever authorization the plaintiffs received to act as real estate brokers and agents for the defendant was originally received through Thom.

Malcolm E. Smith, one of the plaintiffs, testifies that in May, 1914, having learned that the defendant's said property was for sale, he called upon Thom and asked him whether he was authorized to act for the defendant, and that Thom replied that he was. Plaintiff Smith then told him that he understood said property was for sale, and asked him whether he could authorize him to find a purchaser, and that Thom replied that he could. The witness also testified that Thom informed him that other agents had the property for sale. Prior to that time, Messrs. Pease & Elliman, another firm of real estate brokers, acting for the defendant corporation, had posted notices of sale upon the property, and, indeed, had obtained a contract of sale to Messrs. Bing & Bing, who had paid as earnest money the sum of $5,000 of the agreed price of the premises. These purchasers had sought to repudiate the sale, claiming there was a defect in title, and had brought action to recover back their earnest money of $5,000. As the result of this conversation with Thom, plaintiff Smith testified that the property was listed for sale upon plaintiffs' books. Later on, in the same year, plaintiffs wrote Thom a letter, in which they called attention to the fact that the spring before they had called upon him with reference to a sale of the Chapin

Home property, and asked what the price then was for the entire plot and also for the Sixty-sixth street and Sixty-seventh street plots separately, there being two connecting plots of land, one beside that finally sold, which were owned by the defendant. In response to that letter, on November ninth, Thom wrote the plaintiffs that the price of the entire plot of the Chapin Home property was $350,000, $200,000 for the south plot and $150,000 for the north plot, and stated that he would be glad to have a bid for the property. In the same month, and after the receipt of Thom's letter, Rudolph C. Culver, one of the plaintiffs, called upon Thom and informed him that plaintiffs had received his letter offering the property for sale, and that as there was some doubt in his mind whether or not he, Thom, was the proper man to see — whether he had authority to offer the property — he was calling upon him. Culver testifies that Thom replied that he was the man, and that the Chapin Home had left the entire matters relating to the sale of this property in his hands, and that plaintiffs could take it from him. Culver testifies that he further asked him whether the title to the property was involved, as he understood the Chapin Home had sold it to Bing & Bing, and that they were trying to get out of their contract, and that Thom replied that the matter was in litigation, but that he had every reason to believe that it would be settled at an early date, and that if Culver could find a purchaser for the property he would be very glad to have a bid submitted. Culver further testified that he asked Thom whether it was necessary for him to deal with Pease & Elliman, who had signs on the property, and expressed a disinclination to divide his commissions with them, and that Thom replied, " You can come to me direct, you don't have to deal with Pease & Elliman at all."

Acting upon this authority, plaintiffs offered the property for sale to at least two different parties, one of which was the Co-operative Building Construction Company, a New York corporation, of which company one Frederick Culver, father of the plaintiff Rudolph C. Culver, was president. Considerable negotiation appears to have been had between plaintiff Culver and Thom with reference to the sale of the property and concerning cutting it up and selling a portion of it to

the Co-operative Building Construction Company. Thom, claiming to act for the defendant, declined to sell the property in parcels, and finally the plaintiff Culver brought his father, Frederick Culver, and introduced him to Thom as a prospective purchaser. Frederick Culver was a lawyer, and it was suggested by the plaintiff that by reason thereof he would be better able to discuss the marketability of defendant's title. Plaintiff Culver testifies that at this interview between his father, representing the Co-operative Building Construction Company, and Thom, they discussed the marketability of defendant's title, and, after remaining with Thom and his father for a short time, he suggested that inasmuch as he had brought the principals together and they were fairly in a way of agreeing on a purchase and sale of the property, he would withdraw, as he could be of no further assistance to them, and that both Thom and his father agreed that there was no need of his remaining longer.

Frederick Culver testified that Thom stated that defendant was ready to sell the property and give good title thereto for $200,000, and that he, Culver, replied that his company would be willing to pay the $200,000, providing it could get policies of title insurance thereon to enable them to borrow money upon mortgage on the property. According to Frederick Culver's testimony, he was assured by Thom that the defendant had good title to the property and could sell it to his company. Some discussion was had as to whether a policy of title insurance could be obtained until the final determination of the action brought by Bing & Bing to recover back their earnest money, as the basis of which right of recovery they were insisting that defendant's title was defective, the suit involving a question of the constitutionality and validity by which the defendant had obtained title of the property from the city of New York. The question was discussed between Culver and Thom as to the delay which would result from such litigation. It finally developed that the title insurance companies were unwilling, under existing conditions, to furnish a policy upon the property. Thereupon Mr. Frederick Culver called upon the president and recording secretary of the defendant and in the presence of their counsel claims to have stated to them that he was sorry that the

title companies could not be influenced to back up the defendant's title to the property, and that they would have to wait until the determination of the Bing & Bing suit, which might take several years, until finally decided by the Court of Appeals, before its title could be fully established, and that under such conditions he could not ask the ladies representing the defendant corporation to give a binding contract, but he desired that they have a gentlemen's understanding giving his company preference when the matter was finally determined. It is claimed on the part of the respondent that thereupon all negotiations between the Co-operative Building Construction Company and the defendant ceased.

This interview occurred in April, 1915. About a month later Mr. Frederick Culver again took up the matter and made efforts along the line of obtaining a confirmatory deed from the city through the payment by the defendant of an additional consideration for the property, hoping thereby to clear up the defendant's title and obtain the backing of the title companies. He suggested to the representative of the defendant that such confirmatory deed might be obtained from the city upon payment of such additional consideration. Culver agreed with Thom that he would co-operate with defendant in endeavoring to induce the sinking fund commission of the city to accept such additional consideration and clear the title. It was then agreed to allow the Bing & Bing litigation to go to a decision, as a successful termination of such litigation in favor of the defendant would be of assistance in obtaining an adjustment with the city. In July, 1915, the action brought by Bing & Bing was decided by the Supreme Court in favor of the defendant, the court holding that the consideration already paid to the city was adequate and that the defendant's title had always been good. Thereupon a petition was prepared by defendant and presented to the sinking fund commission on October 27, 1915, and a contract of sale entered into between the defendant and Mr. Frederick Culver's company for the purchase by it of the defendant's property for the sum of $205,000, the additional $5,000 being exacted as fees of defendant's attorneys in the Bing & Bing litigation. This contract of sale, owing to the delay in getting the title cleared was not closed and later on

the parties made a subsequent agreement on April 5, 1916, extending the final closing of the contract to May first of the same year. The sinking fund commissioners had, on February 16, 1916, passed a resolution authorizing the giving of a confirmatory deed by the city to the defendant upon three conditions:

*First,* that the defendant should pay the city an additional sum of $23,000 in cash;

*Second,* that defendant should execute to the city a mortgage on so much of the property as was not sold to the Co-operative Building Construction Company, for $25,000, payable five years from date; and

*Third,* that the defendant obligate itself to receive and maintain inmates to a proportion representing fifteen per cent of the total number of inmates, residents of the city of New York, who would otherwise become charges upon the city, in lieu of an existing agreement on the part of the home to maintain other inmates or patients, giving 5,475 days of free treatment or care to such patients or inmates in each year in perpetuity.

It was as the result of the adoption of such resolution that the second contract of April 5, 1916, was executed by the defendant and the Co-operative Building Construction Company. The transaction was closed on April 29, 1916.

As before stated, it is the claim of the defendant, respondent, and the learned court at Trial Term held, that the final sale to the Co-operative Building Construction Company was not due to any effort or procurement on the part of the plaintiffs, but was an entirely new, different and independent transaction from that which the efforts of the plaintiffs inaugurated.

I think the learned trial court was in error in holding that plaintiffs were not the procuring cause of the sale which was finally accomplished. It seems to me that the evidence does not support such determination. The plaintiffs introduced to defendant's representative a purchaser ready, able and willing to take the property at a figure which defendant was willing to accept. The only delay in the proceeding resulted from the weakness in defendant's title to the property. The representative of the purchaser, through practically

continuous efforts on his part, was instrumental in clearing up the fault in defendant's title and in enabling defendant to give a marketable title to the property. The amount which the construction company, represented by Mr. Frederick Culver, was to pay was never materially changed, except that the company finally agreed to increase the purchase price by $5,000 to cover attorney's fees. No commission is claimed by the plaintiffs upon this additional $5,000. It seems to me that the consummation whereby the defendant conveyed to the construction company resulted from a continuance of the original deal and transaction which was procured by the plaintiffs. Mr. Frederick Culver and his company came to defendant solely from plaintiffs' efforts. From the first, he and his company were willing to purchase the property at the defendant's price. He labored consistently to procure a good title to the property, and the mere fact that the net amount which defendant finally received, owing to the necessity of making further settlement with the city in order to obtain good title, was less than $200,000 in nowise affected the transaction, so far as the purchaser was concerned, nor reduced the amount which it paid to the defendant for the property. The further consideration which defendant was compelled to pay to the city to perfect its title and obtain a confirmatory deed of the premises was merely incidental to the transaction of sale and purchase between the defendant and the construction company. The purchaser was entitled to a good marketable title of the property which it bought, and the defendant was required and had agreed to give such title, and any expense it was caused to perfect the same is no more than incidental to the sale of the property.

Under all the circumstances, I think it was a question of fact that the court should have submitted to the jury as to whether or not the plaintiffs were the procuring cause of the sale of defendant's property which was finally effected and thereby became entitled to their commissions.

The learned trial court seems to have held that the evidence as to Thom's agency and authority to act for the defendant was sufficient, and based its decision entirely upon what it deemed was a failure of proof that plaintiffs were the procuring cause of the sale. I think, under all the circumstances,

there was sufficient evidence to show Thom's authority to act. He was a business man of large interests and experience and the owner of valuable real estate properties. He was a member of the advisory board and finance committee of the defendant corporation, whose officers were women. In other transactions of this character, notably concerning the sale to Bing & Bing, he had acted for the defendant, and it was through his instrumentality that Messrs. Pease & Elliman were employed as agents with reference thereto. The subsequent acts of the officers and trustees of the defendant corporation in dealing with the Co-operative Building Construction Company was an adoption of his acts in dealing with the plaintiffs.

I think the record bears evidence which should have been submitted to the jury, not alone as to the agency and authority of Thom to bind the defendant, but also as to whether or not the plaintiffs were the procuring cause of a customer for defendant's property who was at all times ready, able and willing to purchase the property at defendant's price, and who did finally purchase it from the defendant.

The judgment appealed from should be reversed and a new trial granted, with costs to the appellants to abide the event.

CLARKE, P. J., DOWLING and SHEARN, JJ., concurred; LAUGHLIN, J., dissented.

LAUGHLIN, J. (dissenting):

I dissent on the ground that in my opinion Thom was not authorized to employ the plaintiffs, and the employment was not ratified.

Judgment reversed and new trial ordered, with costs to appellants to abide event.